UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------ x

MOM & BABY SUPPLIES INC.,          :

         :

        Plaintiff,   :

         :    <u>MEMORANDUM & ORDER</u>

   -against-      :

         :    Case No. 1:21-cv-03984 (ENV) (TAM)

ABIIE LLC,         :

         :

       Defendant.  :

------------------------------------------------ x

VITALIANO, D.J.

Plaintiff Mom & Baby Supplies Inc. ("MBS"), a marketing and distribution firm specializing in e-commerce, brings this lawsuit against defendant Abiie LLC ("Abiie"), a manufacturer of children's products, asserting claims for breach of contract, unjust enrichment, defamation, and tortious interference with contract. The parties have filed cross-motions for summary judgment. *See* Pl.'s Mot., Dkt. 42; Def.'s Mot., Dkt. 45-1. For the reasons that follow, Abiie's motion is granted and MBS's motion is denied.

Background[1]

This lawsuit arises from the breakdown of a commercial relationship between the parties involving the manufacture, marketing, and sale of children's highchairs. Abiie is a Texas-based manufacturer that brought a wooden children's highchair, the Abiie Beyond Highchair ("Beyond Chair"), to market in 2012. Pl.'s Rule 56.1 Stmt. ("Pl.'s SOF"), Dkt. 42-1, ¶ 1; Dkt. 42-8 (Amazon listing of Beyond Chair). The owner and president of Abiie is Kenneth Chuah. Chuah

---

[1] The facts are drawn from the Rule 56.1 Statements, *see* Dkts. 42-1, 43-1, 44-1, 45-6 at 3–8, as well as the admissible evidence submitted on the record. Citations to pages of the parties' briefing refer to the Electronic Case Filing System ("ECF") pagination, except that citations to a deposition reference the internal document's pagination.

Tr., Dkt. 42-5, at 16:15–17:7.  MBS is a New York-based distribution and marketing firm.  *See* Schaya Tr., Dkt. 45-15, at 85:12–86:15.  As a distributor, MBS works with manufacturers to market and develop their brands in order to increase sales, principally (but not exclusively) on Amazon.  *Id.* at 22:7–15, 86:9–15.  The owner of MBS is Ben Schaya.  *See* Schaya Decl., Dkt. 42-3, ¶ 1.  Neither the dramatis personae nor the essential friction present in their commercial relationship are in dispute.

The parties' relationship began in September 2014, when Chuah and Schaya met at the ABC Kids Expo, a trade show in Las Vegas, Nevada.  Pl.'s SOF ¶¶ 6–7; Schaya Tr. at 27:11–15.  Following the show, the parties discussed MBS becoming a reseller on Amazon for the Beyond Chair.  Pl.'s SOF ¶ 8.  MBS then began purchasing units of the Beyond Chair from Abiie and reselling the chairs on Amazon, which it would continue to do through the end of the parties' relationship in 2021.  *See id.*; Chuah Tr. at 45:21–23, 49:3–5; Pl.'s SOF ¶¶ 32–36, 48.

According to MBS, an agreement was reached between the parties during the early period of this commercial relationship providing that MBS would be the exclusive reseller of the Beyond Chair on Amazon for as long as they continued to invest in and resell the product.  *See* Pl.'s SOF ¶ 10; Schaya Tr. at 22:24–23:7.  MBS claims that this understanding was formed in oral conversations between the parties and in the exchange of e-mails.  Schaya Tr. at 21:21–23:19.  Schaya testified that he was "not sure what points [of the alleged agreement] were written and what points of it were part of the verbal agreement [t]hat we had."  *Id.* at 29:13–15.  With even murkier recollections, Schaya suggests that there may have been follow-up conversations by text message or email, *id.* at 29:15–18, or other conversations.  MBS does not claim that anything in writing other than these emails and text messages documents an exclusive right by MBS to sell Abiie products.  *Id.* at 24:11–18; 27:16–29:18.  Nor was the commercial relationship

ever formalized into a written and independently binding agreement. *See* Chuah Decl., Dkt. 45-7, ¶¶ 2–3; Schaya Tr. at 57:2–58:2.

Chuah, for his part, denies having entered into any exclusive distribution agreement with Schaya, whether verbal or otherwise. Chuah Decl. ¶ 2. According to Chuah, MBS was one of many resellers that Abiie worked with, and MBS simply submitted purchase orders which Abiie fulfilled without any input into MBS's marketing or pricing of the Beyond Chair. *Id.* ¶¶ 4, 7, 10.

Whether or not any exclusive distribution agreement was reached, e-mails submitted into evidence show that MBS did demand to be the exclusive Amazon reseller of the Beyond Chair in spring 2015. *See* Dkt. 42-14, MBS00038. Moreover, these e-mails reveal that Abiie briefly— but temporarily—complied with this request. For instance, on April 29, 2015, Chuah clarified how the new restrictions on other resellers were being implemented and confirmed in the same email that "only Mom & Baby would be the . . . seller for Abiie." *See* Dkt. 42-9, MBS00002; Chuah Tr. at 63:24–64:8. As a result, Wayfair was dropped as a reseller for Abiie. Chuah Tr. at 72:10–21.

At any rate, on May 26, 2015, Chuah advised Schaya of his concerns about continuing any exclusive relationship for fear that it was curtailing Abiie's ability to expand its customer base. *See* Dkt. 42-12, MBS00027–28. He also recognized that, by putting all of the company's eggs in one basket, Abiie would have no cash flow until MBS had sold the supplied products. *Id.* Schaya's response, though cordial, made clear that MBS was making significant investments in this relationship and that the decision to make those investments hinged upon the exclusivity of the relationship. *Id.* at MBS00027. MBS alleges that during a phone call on that date, Chuah confirmed that the parties had reached an exclusive distribution agreement. Pl.'s SOF ¶ 15; Schaya Decl. ¶ 7.

The joust continued through 2016, with the parties scavenging through records and recalled communications; MBS points to emails and documents mentioning exclusivity to show that Abiie had agreed to such a relationship, while Abiie claims that the communications showed why they declined exclusivity for business reasons. *See, e.g.*, Dkt. 42-14, MBS00039; Dkt. 42-17, MBS00301. Simply stated, from June 2015, when Chuah emailed Schaya that he was "not able to commit to exclusivity," *see* Dkt. 42-14, MBS00039, until the end of the parties' commercial relationship in 2021, no emails or other writings submitted into evidence establish an exclusive distribution agreement. Notwithstanding the back and forth, MBS takes the position that Abiie reaffirmed a commitment to the exclusive arrangement. Pl.'s SOF ¶ 21.

Putting all else aside, the parties' relationship was an immediate success. As Chuah wrote in November 2015, MBS "took over the Amazon listing [for the Beyond Chair] and completely overhaul[ed] to move the page to top listing." Dkt. 42-16, MBS00153. From 2014 to 2015, Abiie went from selling an estimate of 5 chairs per week to selling 5 chairs per day through MBS. Dkt. 42-12, MBS00027. As a result, Abiie's sales increased from $125,309.75 in 2014 to $246,710.62 in 2015, largely thanks to sales to MBS, which alone purchased $159,560 of Abiie products—more than half of Abiie's revenue. *See* Dkt. 42-33, Abiie00039; Dkt. 42-32, Abiie00038; Chuah Tr. at 69:9–11. Sales of the Beyond Chair increased by at least 17% during every year of the parties' relationship, *see* Schaya Decl. ¶ 23, and by the end of the parties' relationship Schaya estimated MBS's profits from Amazon sales of the Beyond Chair at $417,414 per year. *Id.* ¶ 22.

Despite the success of the venture, in May 2021 Chuah wrote to Schaya that he was terminating the relationship between the companies. Dkt. 42-42, MBS01020. Chuah alleged that MBS was selling used Abiie products as new, as well as Abiie products with missing parts,

4

on Amazon in violation of both Amazon and Abiie corporate policies. *See* Chuah Decl. ¶ 11. Because Abiie had "an obligation to tell [Amazon] for the safety of children who would be using the baby products," *id.* ¶ 12, Chuah and other Abiie representatives submitted multiple reports to Amazon claiming that MBS was selling mislabeled and faulty products and also encouraged customers to submit similar reports. *See, e.g.*, Dkt. 42-36, Abiie00137–39; *see also* Dkt. 42-30, Abiie00008; Dkt. 42-29, Abiie00002; Dkt. 42-31, Abiie00013; Dkt. 42-35, Abiie00095. In some cases, customers included screenshots listing MBS as the seller of the faulty products in their complaints. *See* Dkt. 42-37, Abiie00174; Dkt. 42-36, Abiie00137–39.

The commercial warfare embroiled parties beyond the litigants here. In the follow-up to the received complaints, MBS received an "Amazon Listing Policy" violation. *See* Dkt. 42-23, MBS01049. Amazon also removed MBS's product listings because they were "not in compliance with our Condition Guidelines." *See* Dkt. 42-22, MBS01023. In addition, Amazon suspended MBS's ability to sell the Beyond Chair, and MBS's Amazon account was placed into "At Risk" status by Amazon and remained at risk for at least six months. Schaya Decl. ¶ 28.

In retort, MBS claims that some of the complaints were outright false, *id.* ¶¶ 27–28, and at the other extreme, that the complained-of conduct had been authorized by Abiie, for example, sending parts from returned items to its customers requesting replacement parts. *Id.* ¶ 29, Pl.'s Counter-SOF, Dkt. 43-1, ¶¶ 57–58. Thus, Schaya does concede that he sent out repackaged items, but claims this practice was authorized, which Chuah denies. Schaya Tr. at 191:19–22, 194:4–21; Chuah Decl. ¶ 11; *see also* Dkt. 45-11, Ex. C (2021 WhatsApp conversation regarding repackaged items).

With the carping stopped and the commercial relationship between the parties ended, MBS filed the instant lawsuit against Abiie on July 14, 2021. *See* Compl., Dkt. 1, at 13.

Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he trial court's task at the summary judgment motion stage . . . is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Demand Elec., Inc. v. Innovative Tech. Holdings, LLC*, 665 F. Supp. 3d 498, 503 (S.D.N.Y. 2023) (quoting *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (alterations in original)). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute over material facts is "genuine" where "a reasonable jury could return a verdict for the nonmoving party" based on the evidence cited. *Anderson*, 477 U.S. at 248.

Assertions of fact made in connection with a motion for summary judgment must be supported by citations "to particular parts of materials in the record" that could be presented as admissible in evidence, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d

6

189, 194 (2d Cir. 2014).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

<u>Discussion</u>

A.      *Breach of Contract*

New York's Uniform Commercial Code applies because this commercial relationship involves a "transaction in goods."  *See* N.Y. U.C.C. § 2-102; *see also* N.Y. U.C.C. § 2-105(1) ("goods" includes "all things . . . which are movable").  "Even where the contract at issue is a distributorship agreement, it is governed by the UCC if it is predominantly for the sale of goods." *E. Mishan & Sons, Inc. v. Homeland Housewares, LLC*, No. 10-cv-4931 (DAB), 2012 WL 2952901, at *4 (S.D.N.Y. July 16, 2012); *see also Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 493 (collecting cases).  "To prevail on a breach-of-contract claim in New York, a plaintiff must prove: '(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.'"  *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted).  "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Demand Elec.*, 665 F. Supp. at 504 (citation and internal quotation marks omitted).

Under the UCC, a contract "for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  *See* N.Y. U.C.C. § 2-204(1).  "In determining whether the parties entered into a contractual agreement . . . it is necessary to look . . . to the objective manifestations of the intent

7

of the parties as gathered by their expressed words and deeds." *223 Sam, LLC v. 223 15th St., LLC*, 161 A.D.3d 716, 717–18, 77 N.Y.S.3d 83 (2d Dep't 2018). If the "parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open." *Alessi*, 578 F. Supp. at 492. Nonetheless, there must still be agreement on the essential terms of the contract so as to lend it sufficient detail to be enforceable by a court, and "whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances." *Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 306 (S.D.N.Y. 2022) (citation modified).

On the totality of the record and in the absence of a genuine dispute about any material fact, it is clear that the parties did not manifest intent to be bound to the exclusivity contract of indefinite duration that MBS claims. The evidence reflects, at most, that Abiie briefly engaged with MBS to act as its exclusive sales agent near the beginning of the parties' relationship. *See* Dkt. 42-9, MBS00002; Chuah Tr. at 72:10–21. However, there is absolutely nothing suggesting that Abiie agreed to do so beyond the time that Chuah concluded that the exclusive relationship with MBS no longer suited his business purposes, which is exactly what he communicated to Schaya when he elected to end that relationship. *See* Dkt. 42-14, MBS00039. The most definitive statement on exclusivity in the record is Chuah's email to Schaya in June 2015 that he was "not able to commit to exclusivity." *See id.* MBS has not submitted record evidence showing a manifestation of intent by Abiie representatives from after that date to enter into an exclusivity arrangement, nor have they submitted evidence suggesting that, had Chuah agreed to exclusivity before June 2015, he was not free to end the parties' exclusive relationship—which he did.

8

MBS's evidentiary argument to the contrary is unconvincing.  For instance, although Chuah wrote to a customer in November 2016 that "the only authorized vendor for Amazon Prime is [MBS]," the context of the email shows that Chuah is telling the customer that MBS is the only authorized vendor between the two that the customer asked about; one was authorized, one was not.  *See* Dkt. 42-17, MBS00301; Chuah Tr. at 81:20–24.  In fact, this email thread also contains a reference to a "list of Abiie authorized vendor," supporting the inference that there was no exclusivity; the existence of a "list" implies other authorized vendors beyond MBS, flatly contradicting any pretense that even at this point, there was any exclusivity in the MBS-Abiie relationship.  Dkt. 42-17, MBS00301.  Nor is Chuah's statement that he looked forward to working with MBS for "years to come" sufficiently precise to confirm the existence of the alleged agreement, as this is the kind of informal language often exchanged in business without giving rise to enforceable contractual obligations.  *See, e.g.*, *Full Circle United, LLC v. Skee-Ball, Inc.*, No. 11-CV-5476 (LB), 2014 WL 12829195, at *6 (E.D.N.Y. May 13, 2014) (holding that "wishing . . . luck" at business meeting did not create contractual liability).  MBS and Abiie did enter into binding agreements for many sales of goods—the individual sales of Abiie products to MBS over the course of their business relationship—but after June 2015, Chuah had put MBS on notice that there was no binding commitment to exclusivity.  Therefore, no such contract was formed.

Independently, MBS's claim falls for failure to comply with New York's statute of frauds, which provides in the case of contracts for the sale of goods:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of

goods shown in such writing.

> N.Y. U.C.C. § 2-201; *see Alessi*, 578 F. Supp. at 503 n.37 (applying § 2-201 to distribution agreement).

The Statute of Frauds applies to this case because it is undisputed that the aggregate value of the purported distribution contract is more than $500. *See* Pl.'s SOF ¶¶ 47–49; Chuah Decl. Ex. A.[2] To satisfy § 2-201, the writing "need not contain all the material terms of the agreement," but it must meet three requirements: "it must evidence a contract for the sale of goods . . . it must be signed . . . and third, it must specify a quantity." *Rienzi & Sons, Inc. v. I Buonatavola Sini S.R.L.*, No. 20-cv-5704 (ERK) (SJB), 2021 WL 5013795, at *3 (E.D.N.Y. Oct. 28, 2021) (citations and internal quotation marks omitted).

The emails, text messages, and other writings submitted by MBS into evidence fail to satisfy the Statute of Frauds because they fail to state the quantity of goods sold. *See* N.Y. U.C.C. § 2-201; *Rosenfeld v. Basquiat*, 78 F.3d 84, 93 (2d Cir. 1996) ("[T]he only term that *must* appear in the writing is the quantity."). Although writings were exchanged between the parties specifying the quantities involved in discrete purchases of Beyond Chairs, no writing in evidence provides a quantity term over the extended, indefinite timespan MBS claims. Indeed, Schaya testified that MBS was never required to purchase a specific number of Beyond Chairs from Abiie in a given year. *See* Schaya Tr. at 96:18–98:3 ("[T]he relationship wasn't based on a

---

[2] Because the alleged distribution agreement was of indefinite length, the agreement separately implicates New York's common law statute of frauds, which is triggered by agreements lasting more than a year. N.Y. Gen. Obl. Law § 5-701. Courts have come to varying conclusions on whether, in the case of a sale of goods, to apply both statutes of frauds. *Compare Beautiful Jewellers Priv. Ltd. v. Tiffany & Co.*, No. 06 CIV. 3085 (KMW), 2007 WL 867202, at *2 (S.D.N.Y. Mar. 21, 2007) *with Regal Custom Clothiers, Ltd. v. Mohan's Custom Tailors, Inc.*, No. 96 CIV. 6320 (SS), 1997 WL 370595, at *4 (S.D.N.Y. July 1, 1997). Because the contract claim is unenforceable both on formation and under the UCC statute of frauds, the Court finds this question unnecessary to resolve.

number."); 105:12–16 ("We cannot put a number on it, to this relationship and to what our commitment to Ken from Abiie was.").

Although N.Y. U.C.C. § 2-306 creates an exception to the quantity requirement for "output" and "requirements" contracts, which instead supply the implicit requirement to use "best efforts," the record evidence does not suggest that such a contract was actually formed. *See* N.Y. U.C.C. § 2-306; *Corning Inc. v. VWR Int'l, Inc.*, No. 05-CV-6532 (CJS), 2007 WL 841780, at *6 (W.D.N.Y. Mar. 16, 2007). Likewise, although § 2-306 provides an "exclusive dealing" exception to the quantity rule for exclusive distribution agreements, Abiie cannot avail itself of the exception to the statute of frauds for exclusivity contracts in the absence of evidence that the parties had indeed formed such a contract. *Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*, No. 16-cv-3181 (MKB) (CLP), 2019 WL 12518722, at *5–*6 (E.D.N.Y. Sept. 4, 2019); *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192–93 (E.D.N.Y. 1986).

At bottom, MBS's case rests on Schaya's testimony that Chuah orally agreed on multiple occasions to an exclusive distribution contract of indefinite length, from the Las Vegas trade show, Schaya Tr. at 21:21–22:23, to the phone conversation on May 26, 2015, Schaya Decl. ¶ 7. But Schaya also testified that nothing in writing beyond the e-mails submitted in evidence documents the alleged exclusivity agreement, Schaya Tr. at 24:11–18; 27:16–29:18, and, as recounted above, although other reasons abound as well, without such a writing evidencing an exclusive dealing arrangement, the breach of contract claim cannot stand.

B.    *Unjust Enrichment*

Under New York law, the elements of unjust enrichment are: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against

11

permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir. 2004). Unjust enrichment "lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties," rooted in "the equitable principle that a person shall not be allowed to enrich [themselves] unjustly at the expense of another." *Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253, 275, 192 N.E.3d 1128, 172 N.Y.S.3d 649 (2022) (cleaned up). "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id.*

The record evidence does not bear out any unjust enrichment of Abiie at MBS's expense, given that the parties enjoyed a mutually successful and lucrative relationship. Although MBS did expend substantial sums—over $2 million—on the marketing and distribution of the Beyond Chair, those expenditures were well rewarded. Pl.'s SOF ¶ 50; Dkt. 42-43, MBS01060; Schaya Decl. ¶ 24. Schaya estimated MBS's profits from sales of the Beyond Chair by 2021 at $417,414 per year, with a steady increase in sales over the course of the entire commercial relationship, and MBS marked up the Beyond Chairs significantly after buying them from Abiie. Schaya Decl. ¶¶ 22–23. MBS benefited from Abiie's design, manufacture, and sale of a successful product just as Abiie benefited from MBS's marketing and distribution efforts. Nor is there any indication in the record that Abiie's "conduct was tortious or fraudulent," which courts take into account in determining whether the defendant has been unjustly enriched. *Schoch v. Lake Champlain Ob-Gyn, P.C.*, 184 A.D.3d 338, 344, 126 N.Y.S.3d 532, 537 (2020) (citing to *Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 334 N.Y.S.2d 388 (1972)). Thus, good conscience does not call for the award of equitable relief between the parties.

12

Moreover, as with its breach of contract claim, MBS's unjust enrichment claim is undone by the Statute of Frauds.  The Statute of Frauds "clearly applies as a defense to claims for unjust enrichment," *Alkholi v. Macklowe*, 858 F. App'x 388, 392 (2d Cir. 2021), and it is "well settled in New York" that "a plaintiff may not assert an unjust enrichment claim to circumvent the statute of frauds" where a breach of contract claim based on the same facts is also dismissed. *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610, 616 (S.D.N.Y. 2010). This is because if a claim for unjust enrichment is "based on the same promise and seeks the same relief as the alleged oral agreement," but that oral agreement is not evidenced by a writing, the claim for unjust enrichment is equally unenforceable.  *Zeising v. Kelly*, 152 F. Supp. 2d 335, 345 (S.D.N.Y. 2001) (citing *Abrams v. Unity Mutual Life Ins. Co.*, 237 F.3d 862, 864–65 (7th Cir. 2001)).  MBS's claim for unjust enrichment is based on the same unenforceable promise as the alleged oral agreement: that Abiie "continuously indicate[d] that Plaintiff would remain an exclusive distributor of Abiie Products."  *See* Compl. ¶ 61; *Almazan v. Almazan*, No. 140-cv-311 (AJN), 2015 WL 500176, at *13 (S.D.N.Y. Feb. 4, 2015).  There being no disputed genuine issue of fact on this point, plaintiff's unjust enrichment claim fails and defendant is entitled to summary judgment.

C.    *Defamation*

A defamation plaintiff in New York must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.  *See Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).  It is "fundamental that truth is an absolute, unqualified defense to a civil defamation action."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) (quoting *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d

13

Cir. 1986)).  Because "in defamation law, as in life, determinations of fact and fiction are not zero-sum," under New York law "a statement need not be *completely* true, but can be *substantially* true, as when the overall 'gist or substance of the challenged statement' is true" to defeat liability.  *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (quoting *Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146–47 (2d Cir. 1986)).

Fundamentally, the unmovable roadblock to MBS's success on its defamation claim is truth.  Rooted in the complaints of ultimate retail customers who had made purchases of Abiie products through MBS, the allegedly defamatory statements about MBS consisted of communications from Abiie to Amazon and Amazon customers claiming that MBS shipped repackaged and defective products as new.  *See* Pl.'s SOF ¶¶ 53–56; Schaya Tr. at 76:21–77:6; 77:24–78:4; Dkt. 42-29, Abiie00002; Dkt. 42-30, Abiie00008; Dkt. 42-31, Abiie00013; Dkt. 42-35, Abiie00095.  No facts of record suggest that the complaining customers were not customers of MBS or that their allegedly defamatory complaints regarding repackaged and defective products were not communicated to Abiie.  In short, the asserted defamatory statements by Abiie for which MBS seeks recompense are cloaked in the truthfulness that Abiie did receive the underlying customer complaints.

The record evidence supporting summary judgment for Abiie went beyond mere words. In several cases, the customer complaints included screenshots which dispositively revealed that MBS was in fact the seller of those products, along with pictures of the defective highchairs. Dkt. 42-37, Abiie00174–76; Dkt. 42-36, Abiie00137–39.  Although not every customer complaint submitted into evidence includes proof that MBS was the seller, those that do sufficiently show the truth of Abiie's reports to Amazon to preclude a dispute of material fact. Moreover, the complaints are corroborated by the WhatsApp communications between the

parties, in which Schaya personally admitted to Chuah and Cheong that MBS had shipped repackaged products. *See* Dkt. 45-11 (Schaya responding "Not a lot" in response to the question, "How many repackaged items [have] been shipped out?").  Finally, further supporting the truth of Abiie's statements is Schaya's testimony that MBS had "no way of knowing" if they ever mistakenly shipped repackaged products as new to customers.  Schaya Tr. at 194:10–21. Therefore, Abiie's statements to Amazon and disgruntled customers about MBS were substantially true, and summary judgment on the defamation claim is granted in favor of Abiie.

D.      *Tortious Interference with Contract*

"The elements of a tortious interference with contract claim are (a) the existence of a valid contract with a third party; (b) a defendant's procurement of a third party's breach of that contract without justification; and (c) damages to plaintiff resulting therefrom." *Am. Para Pro. Sys., Inc. v. LabOne, Inc.*, 175 F. Supp. 2d 450, 457 (E.D.N.Y. 2001).  To show tortious interference with a contract, the plaintiff must show that "the defendant used 'wrongful means' to procure the third party's breach." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008) (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001)).  The New York Court of Appeals has defined "wrongful means" to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp*, 50 N.Y.2d 183, 191, 406 N.E.2d 445, 428 N.Y.S.2d 628 (N.Y. 1980).

The relevant contracts with respect to this claim are MBS's contracts with Amazon, which MBS claims that Abiie interfered with by communicating with Amazon regarding complaints from MBS purchasers of its products that those products were defective or

repackaged and sold as new, which violated Amazon's policies. *See* Compl. ¶¶ 66–68, 74. In other words, MBS bases its tortious interference with contract claim on the same allegations as its defamation claim: that Abiie "intentionally and improperly interfered with Plaintiff's advantageous and contractual relationship with Amazon by complaining, in writing, to Amazon, that Plaintiff was violating Amazon's policies." *See* Compl. ¶ 68. However, as explained, the evidence in the record reveals that Abiie's complaints to Amazon were substantially true, nor could a reasonable jury find otherwise. *See supra* Section III.C. As a consequence, because these claims were substantially true, they are not fraudulent or false and do not constitute "wrongful means" used by Abiie against MBS. *See Guard-Life*, 50 N.Y.2d at 191. Therefore, summary judgment is granted to Abiie on MBS's claim for tortious interference with contract.

Conclusion

For the foregoing reasons, Abiie's motion for summary judgment is granted in its entirety and MBS's motion for summary judgment is denied.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated:   Brooklyn, New York

June 21, 2026

/s/ Eric N. Vitaliano
_____

ERIC N. VITALIANO

United States District Judge